**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

Janine Senanayake,

                        Case No. 2:15-cv-65

        Plaintiff,

    v.                              Judge Graham

Delaware County Board of
Commissioners, et al.,

        Defendants.

<u>Opinion and Order</u>

Plaintiff Janine Senanayake, a former deputy sheriff for the Delaware County Sheriff's Office, brings this Title VII action alleging that she was sexual harassed by another deputy sheriff while on and off duty. <u>See</u> 42 U.S.C. § 2000e, *et seq.* Named as defendants are the Delaware County Board of Commissioners and the Delaware County Sheriff's Office. Senanayake further alleges that she was subjected to retaliation when she informed her supervisors of the harassment and that she was unlawfully terminated because of her sex and because of a physical disability relating to her knee.

This matter is before the court on the defendants' motion for summary judgment. For the reasons stated below, the court grants the motion in part and denies it in part.

## I. Background

### A. Plaintiff Hired as a Corrections Officer

Senanayake applied to be a deputy sheriff with the Delaware County Sheriff's Office in 2010. (Doc. 61-124). Her employment history showed that she had been employed by three separate police agencies in Ohio. (<u>Id</u>.). Her length of employment at these three police agencies ranged from three months to one year.

A background investigation and check of Senanayake's references contained a number of positive referrals but also some areas of concern. One reference indicated that a "cloud of drama" seemed to follow Senanayake at the Medina County Sheriff's Office, and another viewed her as a "liability," based on her history of getting into incidents for which she was disciplined at the Montville Township Police Department. (Doc. 61-30 at PAGEID 2, 5). Also of concern was the event that led to Senanayake being fired by the Perry Township Police Department in July 2009.

Dash cam video showed Senanayake and the Chief of Police, who later resigned, kissing and caressing in a police cruiser while an inmate slept in the back of the car. (Id. at 5). The video footage was posted online and became associated with the moniker of "Kissing Cop." (Senanayake Dep. at 55).

Sheriff Walter L. Davis, III and Captain Kevin Savage of the Delaware County Sheriff's Office were in charge of hiring at the time Senanayake applied to be a deputy sheriff. (Davis Dep. at 91, 97). Captain Savage was opposed to hiring Senanayake. He was concerned about the results of the background investigation and about the potential disruption that could come from "Ms. Senanayake's notoriety in the media as the 'Kissing Cop.'" (Savage Aff. at ¶ 3). After interviewing Senanayake twice, Sheriff Davis believed that she had made some mistakes in the past but had an overall good work record. (Davis Dep. at 91-95). Sheriff Davis made the decision to hire Senanayake but wanted her to start as a corrections officer for a period before she could become a deputy. (Id. at 93-94).

Senanayake began her employment as a corrections officer on September 15, 2010, subject to a one-year probationary period under Ohio Revised Code § 124.27. (Doc. 61-31). During this period, she served as an at-will employee and was not a member of the collective bargaining unit. (Id.; Savage Aff. at ¶ 4).

**B.    Alleged Sexual Harassment by Deputy Pitts**

Deputy Sheriff Rashad Pitts and Senanayake met soon after she became a corrections officer. Pitts brought individuals to the Delaware County jail for processing and Senanayake had "very brief conversations" with him, as she would with other deputies. (Senanayake Dep. at 174). The "first few times he came in[,] it was fine." (Id. at 175). But at some point within the first month of Senanayake's employment, Pitts allegedly said, "[S]he's the woman that's going to have my baby." (Id. at 174-75). He said this while he and Senanayake were in the booking area of the jail and said it loudly enough that law enforcement personnel and inmates nearby could hear him. (Id. at 175). Senanayake "felt very embarrassed" and demeaned. (Id. at 176).

Pitts admits to having made a comment to Senanayake, though he recalls having said, "[I]t only takes two minutes to have a baby." (Pitts Dep. at 9). According to Pitts and other deputies who were present, Pitts made his statement in response to Senanayake grabbing her crotch and saying, "Pitts, you couldn't handle this." (Pitts Aff. at ¶ 2; Dore Aff. at ¶ 5; Burke Aff. at ¶ 9). Senanayake denies having made such a gesture or statement. (Senanayake Dep. at 223).

According to Senanayake, from that point forward Pitts "constant[ly]" made unwelcome comments to her. (Senanayake Dep. at 223). His comments included repetition of "baby-making" statements and requests that she go out with him, which she always declined. (Id. at 176) (testifying that he asked, "[W]ant to go out? Want to go to the clubs?"). Senanayake also states that Pitts made the following comments to her: "You're sexy, you're hot"; you have "nice legs" and a "nice body"; you are "beautiful" and "pretty"; "I would like to take you to the club" and have you "on my arm"; and "I'm going to marry you some day." (Id. at 176, 178). She repeatedly asked Pitts to stop making such comments, but "he just laughed everything off, [like] it was nothing." (Id. at 188-89).

Senanayake felt that the comments made by Pitts were harassing, demeaning and embarrassing. (Senanayake Dep. at 189). Some of the comments occurred in front of co-workers and inmates in the booking area of the jail. (Id. at 186). She believed that this conduct caused others to disrespect her. (Id. at 192, 227). Inmates who heard Pitts harass her made similar comments to her and boasted that she could not "write them up" because they were saying nothing worse than what Pitts had said to her. (Id. at 228). Senanayake received messages in her mailbox, she believed from other employees, with the word "bitch" or "cunt" on them and with statements of how she did not deserve to be in law enforcement. (Id. at 274-76).

According to Pitts, he made the baby-making comment just once and did not repeat it. (Pitts Dep. at 9). Pitts denies ever asking Senanayake out, having "ever come on to her in any way" or ever making any sex-based comments to her. (Id. at 11; Pitts Aff. at ¶ 2). Pitts states that the two of them did "joke" one time "about going to a club together." (Pitts Aff. at ¶ 2). This joke precipitated Senanayake grabbing her crotch and telling Pitts that he "couldn't handle this" and Pitts responding that "it only takes two minutes to have a baby." (Id. at ¶ 2). Pitts states that both of them laughed after that exchange. (Id.).

Senanayake states that one of her supervisors, Sergeant Jessie Jackson, observed Pitts making comments to her. (Senanayake Dep. at 176). Senanayake complained to Jackson about the comments Pitts made and stated that it was "awful" and made her feel "very embarrassed."[1] (Id. at 176, 180, 187-88). Jackson said she would deal with the matter, but she never did. (Id. at 188).

---

[1] Senanayake testified that when she was a corrections officer, she typically memorialized her complaints in the form of an Inter-Office Communication (IOC). (Senanayake Dep. at 265). The evidentiary record at the summary judgment stage does not contain any IOCs in which she complained to Jackson about Pitts, but it should be noted that defendants' motion does not argue that Senanayake failed to properly address her complaints to Jackson.

Senanayake also complained to Jackson about the messages she received in her mailbox, but nothing was done about it, so far as Senanayake knows. (Id. at 276).

According to Jackson, she never observed Pitts make an improper comment to Senanayake. (Jackson Aff. at ¶ 2). Jackson also denies that Senanayake ever complained to her about any comments made to Senanayake by Pitts. (Id.). In her affidavit, Jackson does not address whether she was aware of the alleged messages Senanayake received in her mailbox.

Though Senanayake describes the harassing comments from Pitts as having been "constant," it is uncertain how much contact Senanayake and Pitts had while she worked as a corrections officer. According to Jackson, who served as Assistant Director of the Jail, road patrol deputies like Pitts came to the booking area of the jail to drop off inmates or do paperwork but otherwise were "rarely in jail." (Jackson Aff. at ¶ 3). Senanayake states that Pitts made comments to her when he was dropping inmates off and that he came to the jail to see her even when he did not have an inmate to drop off. (Senanayake Dep. at 186-87). Further, Pitts states that while Senanayake was a corrections officer, "she regularly asked to do ride-alongs with [him] to learn the patrol side so she could be promoted one day to Deputy Sheriff." (Pitts Aff. at ¶ 3). Pitts allowed her to join him for ride-alongs on three or four occasions. (Pitts Dep. at 18).

Senanayake also states that Pitts made a sexually-harassing comment to her at a courthouse. (Senanayake Dep. at 180, 271). Pitts made the comment in front of a security officer, who laughed when he heard it. (Id. at 180). The content of what Pitts said and when exactly the incident took place is not reflected on the record before the court – during her deposition, Senanayake was not asked any further questions about the matter.

Senanayake further asserts that there were "[q]uite a few times" where Pitts tapped her backside with a clipboard as she was filing out of a room with deputies following roll call. (Senanayake Dep. at 179-80). Pitts denies that he tapped her backside with a clipboard. (Pitts Aff. at ¶ 2). It is unclear from the record exactly when this alleged conduct occurred – whether it happened when Senanayake was a corrections officer, a deputy, or both. A fair reading of the Senanayake's testimony is that it at least started when she was a corrections officer and would report to roll call when she allowed to do a ride-along. (Senanayake Dep. at 177).

## C.     Promotion to Deputy Sheriff and Perceived Favoritism from Sheriff Davis

Lieutenant Colleen Wilson prepared a performance review of Senanayake on December 5, 2010. The review sheet listed 67 areas or items for which a score between 1 and 5 was assigned. Wilson predominately gave scores of 3 to Senanayake. (Doc. 61-37) (showing that a score of 3 was

given 61 times and that scores of 2 and 4 were given for the other items). This performance review received the attention of Sheriff Davis. He personally marked up the review with his critique of Wilson's assessment. (Id.; Wilson Aff. at ¶ 3). Sheriff Davis discussed the matter with Wilson and stated that Senanayake deserved higher scores. Wilson "felt pressured to change [her] assessment based on his angry response." (Wilson Aff. at ¶ 3).

In April 2011, Senanayake took a complaint – that Sergeant Randy Pohl was harassing her with repeated requests to go on a date with him – directly to Sheriff Davis. (Doc. 61-40). Her directly reporting to him was contrary to the sexual harassment policy, which instructed employees to make complaints to immediate supervisors, and contrary to Sheriff Davis's well-known policy that concerns were to be addressed only through the chain-of-command. (Ex. 15 at § IV; Davis Dep. at 179-80; Savage Aff. at ¶¶ 13-14; Petrozzi Aff. at ¶ 5). Despite Senanayake jumping the chain-of-command, Sheriff Davis assigned Captain Savage to handle her complaint. (Doc. 61-40).

Sheriff Davis promoted Senanayake to deputy sheriff on May 5, 2011. (Doc. 61-45). In this position, she was required to begin a new one-year probationary period. (Id.). Probationary deputies had to complete a three-month field training period in which they were paired with experienced officers for on-the-job training. (Buttler Aff. at ¶ 4).

At Sheriff Davis's direction, deputy Kevin Turner was assigned to be a field training officer for Senanayake. During the field training, Turner observed numerous concerns with Senanayake's performance. He believed that she "consistently stopped minority motorists at much higher rates than white drivers" and that she disregarded his warning not to engage in racial profiling. (Turner Aff. at ¶ 5). He observed that she "regularly turned off her microphone to take personal calls from Sheriff Davis" and that she was "almost constantly texting if she was not driving." (Id. at ¶ 6). Turner states that he was hoping to receive a promotion at the time and, because of his fear of retaliation from Sheriff Davis, he "did not accurately document her performance deficiencies" or otherwise address her "improper behavior." (Id. at ¶¶ 3, 6).

By this time, many officers had formed the perception that Senanayake was receiving special treatment from Sheriff Davis and had direct access to him. (Turner Aff. at ¶ 3) (stating that there were rumors circulating that the "usual rules" did not apply to Senanayake); (Campbell Aff. at ¶¶ 7-8) (stating that Senanayake claimed to know of Sheriff Davis's personal likes and dislikes); (Spring Aff. at ¶ 4) (stating that he believed Senanayake and Sheriff Davis often texted each other during morning roll call). Captain Savage thought that it was unusual for Senanayake to have been promoted to deputy without completing her probationary period as a corrections officer and that it

was unprecedented for Sheriff Davis to have ordered that she receive a coveted day shift with weekends off work. (Savage Aff. at ¶ 12; see also Vance Dep. at 43). Chief Deputy John Petrozzi was instructed by Sheriff Davis to ensure that Senanayake was given a day shift as a reward for her loyal service. (Petrozzi Aff. at ¶ 8). Many officers, including Pitts, believed that "Sheriff Davis would retaliate against anyone who Ms. Senanayake disliked." (Pitts Aff. at ¶ 4; Spring Aff. at ¶ 3; Burke at ¶¶ 3-4)).

In the summer of 2011, Senanayake and Sheriff Davis began having a romantic relationship. (Senanayake Dep. at 146-47). At the time, Sheriff Davis was married; he viewed his marriage as having been "long over" before he began his relationship with Senanayake. (Davis Dep. at 155).

**D.** **Additional Alleged Sexual Harassment by Pitts and the Incident at the County Fair**

Senanayake asserts that at some point in the summer of 2011, Pitts pulled her over on U.S. Route 23 while she was off-duty. Pitts told her that he had turned off his microphone and that he pulled her over so that he could see what she was wearing. (Senanayake Dep. at 249-50). Pitts commented that she had "nice boobs" and legs and said that he wished he could take her somewhere when he got off work.[2] (Id. at 250). Senanayake told him no and questioned why she had been pulled over, at which point Pitts said "whatever" and walked back to his car. (Id.). Pitts states that he pulled Senanayake over because she was speeding, but decided not to give her a ticket when he realized that she was the driver. (Pitts Dep. at 10). He denies that he asked her out or made any comments about her appearance. (Id. at 11).

In mid-September 2011, Pitts and Senanayake were working at the Delaware County Fair. When they drove past the car of Sheriff Davis on a golf cart, Senanayake said, "I wonder whose car that is." (Pitts Aff. at ¶ 7). Pitts, who intended to be making a joke, replied, "Oh please, you know whose car that it. It's parked outside your house every night." (Id.). Senanayake took offense to this remark and called Pitts a liar. (Id.). Pitts claims that Sheriff Davis angrily approached him at the fair that night, got in his face and threatened to fight him. (Id.; Pitts Dep. at 13-14). Sheriff Davis denies that any altercation took place. (Davis Dep. at 164).

---

[2]  In her complaint and brief in response to the motion for summary judgment, plaintiff further alleges that Pitts said that she was a "hot piece of ass" out of uniform, but plaintiff has not cited any evidence in support of this allegation.

### E.    Plaintiff's Discussions with Sergeant Burke and Alleged Retaliation

Within her first month as a deputy, Senanayake told Sergeant Jonathan Burke, one of her supervisors, about the comments Pitts had made to her when she was a corrections officer. (Senanayake Dep. at 192-93).  She said to him that the comments had been made in front of other people and were "demeaning" and "embarrassing" and that "people start to mistreat you . . . when you have someone who is wearing the same uniform that disrespects you."  (Id. at 192).  She asked that Burke tell Pitts to stop making such comments.  Burke initially responded that Pitts was his "buddy" and a "good dude" and was just "kidding around."  (Id.).  But Burke agreed to "tell him to stay off," though Senanayake asked that it not "become a big investigation."  (Id.).

Within a couple of days, Senanayake "knew [Burke] had said something to Pitts because his entire demeanor" changed when they were at morning roll call.  (Senanayake Dep. at 193).  Instead of Pitts greeting her with his usual "hello" or "hey, sexy," he would say nothing to her and would give her "threatening" looks.  (Id. at 193-95).  Burke himself and at least one other officer, whom Senanayake believed was friends with Burke, changed their attitudes towards her as well. (Senanayake Dep. at 194-95).  Instead of being "super friendly," they started giving her "a cold hello."  (Id.).  Senanayake felt "alienated."  (Id. at 199).

Senanayake claims that Pitts told her that "snitches get stitches and end up in ditches." (Senanayake Dep. at 177, 237).  Pitts then stated that an officer had "told on" him at a prior law enforcement job.  (Id.).  When that officer needed back-up, Pitts deliberately delayed in coming to the scene and the officer "got beat up pretty bad" in a fight.  (Id. at 177-78).  Pitts laughed as he recounted this story to Senanayake.  (Id.).

According to Pitts, he did say something to the effect of "snitches get stitches" in Senanayake's presence.  He recalls having said it back when she was doing ride-alongs (not after she talked to Burke) and in the context of them "joking around" when they heard on the radio an "old rap song" with lyrics containing that phrase.  (Pitts Dep. at 11-12).  Pitts denies that he told her a story about not coming to a fellow officer's aid.  (Id. at 12-13).

At some point Senanayake talked to Burke when they were walking to their cars. (Senanayake Dep. at 199).  She told him that things had become "worse" because Pitts was "being different."  (Id.).  Burke told her that Pitts would "come around."  (Id.).  When nothing seemed to change, Senanayake went to Burke's office and "took a completely different approach" to try to "smooth things over."  (Id. at 199-201).  According to Senanayake, "I told him [Burke] that it was fine . . . to just kind of let it go, that he's [Pitts] – he's fine, he's okay – you know, he's harmless. . . . I

know that I tried to take a completely different approach when the first approach did not work." (Id. at 201). Burke responded by asking her if she was sure that everything was fine, to which she said it was. (Id. at 201-02).

Burke offers a different version of the matter. He admits that Senanayake told him about Pitts saying that he wanted to have her babies. (Burke Dep. at 33, 38). But she did not report that Pitts had made any other comments to her. (Id. at 33-34). Burke asked Senanayake what action she would like him to take, and she said, "[N]othing, we're like brother and sister, we joke like that all the time." (Id. at 34, 37). Burke took that statement to mean that "she didn't care and she didn't want to do anything about it." (Id. at 38). They had no further conversation about the comment and Burke said nothing to Pitts. (Id. at 35, 39).

On August 18, 2011, Burke had a conversation with Senanayake about Pitts. It was precipitated by a text message that Burke inadvertently received from her – he believed the text was meant for Sheriff Davis – in which she complained, "Burke is unfair." (Burke Aff. at ¶ 9). During the ensuing conversation, Senanayake stated that she "really liked" Pitts and had "no problem" with him." (Id.).

Burke states that on one occasion Senanayake told him that people were giving her "the cold shoulder." (Burke Aff. at ¶ 10). In Burke's view, "she did not appear to get along well with people at the office" because people perceived that she had a special relationship with Sheriff Davis. (Id.). "She denied there was a relationship and did not want to hear any advice from me about how to repair her relationships with her colleagues." (Id.).

### F.    Plaintiff's Communications with Chief Petrozzi and Alleged Retaliation

Burke remained "angry that [Senanayake] came to him complaining about his friend." (Senanayake Dep. at 242). Believing that the unpleasant demeanor of Burke, Pitts and others toward her had not improved, Senanayake went to Chief Petrozzi at the end of the summer of 2011. (Id. at 217). She told Petrozzi that Burke's "whole demeanor" and attitude had changed since she complained to Burke about Pitts. (Id. at 218-19). She said that Burke was "unfair" and "doesn't treat me like he does the rest of them, he's cold to me, he's inconvenienced when I call or have a question, he's very – rude." (Id. at 221). She explained that she did not enjoy her work anymore. (Id. at 223). Petrozzi responded that Burke was "fine" and that everybody should try "to get along." (Id. at 222).

Petrozzi does not recall having a conversation with Senanayake about her making a complaint to Burke regarding Pitts. (Petrozzi Dep. at 64). He does recall that she spent "a lot of

time" talking to him about various topics, including her interactions with supervisors, and that "there was a perception on [her] part that [Burke] was a little harder on her than everybody else." (Id. at 62-64, 107). When Senanayake complained that Burke was overly critical of her, Petrozzi told her that Burke was simply trying to help her improve as a deputy. (Petrozzi Aff. at ¶ 12). Petrozzi believed that Senanayake "just could not accept constructive criticism" and that she leveraged her relationship with Sheriff Davis to discourage objective evaluation of her performance. (Id. at ¶¶ 9-15) (recounting instances either where, in Petrozzi's view, Sheriff Davis retaliated against supervisors who had offered critiques of Senanayake or where critiques were not made in order to avoid retaliation).

Senanayake claims that the situation did not improve after she talked to Petrozzi. (Senanayake Dep. at 222-23). Burke started treating her "even worse." (Id. at 242). Burke would question, chastise and yell at her over the police radio regarding traffic stops she had conducted. (Id. at 215-16, 243). Burke did not engage in such conduct with other deputies. (Id. at 216). Burke would also resist her efforts to take time off, in a way he did not do to others. (Id. at 242-43).

In the fall of 2011, Petrozzi became aware of the baby-making comment that Pitts had made to Senanayake about a year earlier. According to Petrozzi, Senanayake told him about the comment.[3] (Petrozzi Aff. at ¶ 21; Petrozzi Dep. at 102). She did not mention any other instances of harassing behavior by Pitts. (Petrozzi Dep. at 103). Petrozzi told her that the comment was inappropriate and that he would talk to Pitts. (Id.; Petrozzi Aff. at ¶ 21). Petrozzi met with Pitts and told him that he would "whoop his ass" if such behavior happened again. (Petrozzi Dep. at 102-03; Petrozzi Aff. at ¶ 21). Pitts took responsibility for having once made the comment and "agreed never to say anything like that again." (Id.).

In Senanayake's view, Pitts started to treat her worse. Pitts told her about meeting with Petrozzi, who said to Pitts that he "would take a Louisville slugger to [Pitts's] head." (Senanayake Dep. at 236). "Pitts was horrible after that. Like glare – he would glare. . . . [A]nd he would be mumbling oh that F'ing bitch to someone he was talking to about me, and I was right there." (Id. at 236). Pitts again stated that "snitches get stitches and end up in ditches," and this time she felt that it "was directed directly at [her]." (Id. at 235, 237). He stated further, "[D]on't ever . . . expect me to come fast to you if you're calling for help. . . . I don't deal with people that snitch. (Id. at 237).

---

[3] Senanayake says that she did not talk to Petrozzi about Pitts, but she believes that Petrozzi may have learned of the baby-making comment from talking with Burke. (Senanayake Dep. at 218, 234).

In mid-December 2011, Senanayake submitted an IOC to Lieutenant David Buttler requesting a meeting with the command staff (Sheriff Davis, Captain Savage, Captain Scott Vance, Chief Petrozzi) and Sergeant Burke. (Doc. 61-104). Senanayake states that the reason for requesting the meeting was to raise her complaint that the cold and threatening demeanors of Burke and Pitts had not changed.[4] (Senanayake Dep. at 222). Buttler forwarded the request to Petrozzi. (Buttler Dep. at 71-72). Petrozzi attempted to schedule a meeting but found that he could not arrange a meeting with everyone present because Senanayake was taking leave and because others were taking holiday leave and sick leave. (Doc. 61-104 at 4; Petrozzi Dep. at 109; Petrozzi Aff. at ¶ 22). On January 5, 2012, he emailed the command staff asking if they would be available to meet on January 9 to discuss Senanayake's "concerns related to Sgt. Burke." (Doc. 61-104 at 2). However, Petrozzi found out that Burke was suffering from health issues and was taking extended medical leave beginning on January 6. (Petrozzi Dep. at 110; Burke Aff. at ¶ 12). Petrozzi states that he consulted with Senanayake, who said that she wished to postpone the meeting until Burke returned to work. (Doc. 61-104 at 1; Petrozzi Aff. at ¶ 22). As it would turn out, a meeting never took place. (Senanayake Dep. at 233). Burke did not return to work until after Senanayake was terminated, and Petrozzi resigned in February 2012 because he disliked Sheriff Davis's "abusive management style." (Burke Aff. at ¶ 12; Petrozzi Aff. at ¶ 22).

## G.    Senanayake's Traffic Stop of Pitts

On March 7, 2012, Senanayake pulled Pitts over for speeding. (Senanayake Dep. at 238; Pitts Aff. at ¶ 5). She did not know that it was him. (Senanayake Dep. at 238-39). Pitts was off-duty and "wearing a hoodie and driving an old Cadillac." (Pitts Aff. at ¶ 5). Pitts, who is African-American, had formed the belief from working with Senanayake that she disproportionately stopped black motorists. (Pitts Dep. at 29; Pitts Aff. at ¶ 5).

Later that day, Pitts emailed Sergeant Larry Dore. (Doc. 61-97). Pitts, who acknowledged that he was traveling slightly above the speed limit, thought that the real reason Senanayake pulled him over was his race, clothing and type of car. Dore forwarded the email to Lieutenant Chris

---

[4]   It is unclear whether Senanayake's reason for requesting a meeting was stated in the IOC. Plaintiff's response brief asserts that it was (Doc. 62 at 16), but no evidence is cited in support. Senanayake's deposition testimony does not provide any indication. (Senanayake Dep. at 222-23, 233, 279-81). During discovery, a copy of the IOC could not be found. Lieutenant Buttler recalls having received the IOC and, because it requested Burke's presence at the meeting, he believed it related to the "personality conflict" between Senanayake and Burke. (Buttler Dep. at 74).

Burden. Senanayake believes Pitts sent the email intending to "get [her] in trouble." (Senanayake Dep. at 240).

Sheriff Davis became aware of Pitts's email. Sheriff Davis, who is African-American, found it hard to believe that Senanayake "was dating a black guy, but yet racially profiling another black guy." (Davis Dep. at 165). He called a meeting in which he, Pitts, Captain Savage and Captain Vance were present. (Pitts Aff. at ¶ 6; Savage Aff. at ¶ 39; Vance Aff. at ¶ 6). A union representative was not present at the meeting, which Pitts thought was unusual. (Pitts Aff. at ¶ 6). According to Pitts and both Savage and Vance, Sheriff Davis yelled at Pitts and threatened to fire him for having accused Senanayake of racial profiling. (Pitts Aff. at ¶ 6; Savage Aff. at ¶ 39; Vance Aff. at ¶ 6). Sheriff Davis denies having done so. (Davis Dep. at 165-66). Pitts complained to his union representative about Sheriff Davis bullying him. (Pitts Aff. at ¶ 6; Hegedus Aff. at ¶ 3).

### H. Sheriff Davis Resigns

In early April 2012 it was publicly revealed that the Ohio Bureau of Criminal Investigation had been investigating an allegation that Sheriff Davis had misused public funds to pay for Senanayake to accompany him on an out-of-state trip. (Doc. 61-29). Sheriff Davis resigned on April 9, 2012 and agreed to repay the funds in question. (Id.). Captain Vance was appointed as Acting Sheriff. (Vance Aff. at ¶ 1).

### I. Senanayake's Knee Injury

On Wednesday, April 11, 2012 Senanayake participated in a training exercise at the Ohio State Highway Patrol. (Senanayake Dep. at 163; Doc. 61-107). During the exercise her left knee "snapped to the outside and it was pretty painful." (Senanayake Dep. at 163). Her knee appeared to be swollen and the instructor had her stop for the day, but she was able to walk out on her own accord. (Id. at 164). She reported to training on the next day. (Id.). She took a day of sick leave on Friday. (Doc. 66-8 at 22).

On Monday, April 16, 2012, Senanayake saw an orthopedic doctor. (Doc. 61-107). He took an X-ray and assessed her injury as a sprain and possible meniscus tear, for which he ordered an MRI. He instructed her to take over-the-counter anti-inflammatory medication for pain and swelling, and he advised that she take one week off work. (Id.). Senanayake took sick leave that week and provided medical verification to her supervisor. (Doc. 66-8 at 18-19, 21).

On April 19 Senanayake received the results of her MRI. She was diagnosed with a bone contusion, but no tear. (Doc. 61-109). She reported that she was still in pain, and her doctor

instructed her to take two additional weeks off work and return for a follow-up appointment. (Id.). Senanayake took sick leave through May 4. (Doc. 66-8 at 14, 15, 20).

Senanayake returned to her doctor on April 30 and reported that she was "a lot better." (Senanayake Dep. at 169; Doc. 61-110). She had a full range of motion in her knee, with much less pain, and the swelling was gone. (Senanayake Dep. at 169-70; Doc. 61-110). The doctor released her to immediately "go back to full activities unrestricted." (Doc. 61-110).

### J. Senanayake's Termination and Her Work Performance Deficiencies

On April 24, 2012, Acting Sheriff Vance notified Senanayake that her employment was terminated on that day because of her "failure to satisfactorily complete [her] probationary period." (Doc. 61-34). In making this decision, Acting Sheriff Vance relied upon an End-of-Probation Review document prepared by Captain Savage on April 18, 2012. (Doc. 61-91; Vance Dep. at 24-26; Vance Aff. at ¶ 8). Captain Savage prepared the Review after examining records relating to Senanayake and speaking with various individuals in the Sheriff's Office who had observed her performance. (Vance Dep. at 135-37). Among other things, the Review described five "Disciplinary Issues" and twenty "Documented Incidents" from June 2011 to March 2012.

The disciplinary issues included two instances in which Senanayake received discipline that was consistent with the discipline given to other deputies for the same or similar infractions. One instance was an October 2011 car accident in which Senanayake was determined to be at fault while driving her police cruiser. (Doc. 61-116). Senanayake received a written reprimand – common discipline for a deputy's first at-fault accident. (Id.; Savage Aff. at ¶ 17). The second instance was Senanayake's failure to appear at three court hearings in February 2012, for which she was suspended for one day – the same discipline given to another deputy who had missed court. (Doc. 61-88; Savage Aff. at ¶ 29).

For the other three disciplinary issues, Senanayake committed infractions that Captain Savage believed warranted discipline. She did not receive discipline because, in Captain Savage's opinion, Sheriff Davis intervened to prevent it. Senanayake was involved in a second at-fault accident with her cruiser, but Sheriff Davis prohibited an administrative investigation from being initiated after the accident. (Savage Aff. at ¶ 27). This spared her of the usual discipline of a suspension and remedial training. (Docs. 61-51, 61-52, 61-54, 61-55). Senanayake was also the subject of a citizen complaint that she was texting while driving her cruiser. (Doc. 61-56 at 6). After Chief Petrozzi investigated and substantiated the complaint, Sheriff Davis ordered him to close the investigation, thereby precluding a one-day suspension for Senanayake. (Petrozzi Aff. at ¶ 17).

Finally, Senanayake violated the policy against cell phone use while operating a cruiser for a second time, again with Sheriff Davis directing that she not be disciplined. (Id.; Doc. 61-91 at 2-3).

The "Documented Incidents" included numerous instances in which Senanayake had to call a dispatcher to get directions while responding to a call because she was unable to navigate around Delaware County. (Doc. 61-91 at 3-4; Burns Aff. at ¶¶ 2-3). The Review also included instances in which Senanayake failed to accurately investigate a car accident and issued a ticket to the wrong driver, left her cruiser running unattended, and did not comply with the formal dress code. (Doc. 61-91 at 3-4). And the Review included several instances of complaints from citizens and co-workers that Senanayake had engaged in unprofessional conduct, including racial profiling, getting into a verbal altercation with (and pushing) another deputy while at the scene of a shooting, and treating citizens rudely.[5] (Id.). In Captain Savage's experience, Sheriff Davis typically investigated and sanctioned "even minor infractions," but when Senanayake was the one committing an infraction, he directed that it be overlooked. (Savage Aff. at ¶¶ 16, 23).

The Review noted other areas of concerns. Senanayake was deficient in preparing police reports – her reports often were incomplete, lacked basic information and contained misspellings and grammatical errors. (Doc. 61-91 at 4; Burke Aff. at ¶ 8; Spring Aff. at ¶ 2; Doc. 61-80; Doc. 61-75). She sometimes failed to fill out her cruiser logs properly. (Doc. 61-91 at 5). Captain Savage noted too that Senanayake, as a probationary employee, had displayed an unwillingness to learn how to perform certain aspects of her job, such as becoming geographically oriented with the county, preparing reports and paperwork and having an understanding of policies and procedures.[6] (Id.; Doc. 61-86). She was not receptive to correction or supervision and had a judgmental attitude toward co-workers. (Doc. 61-91 at 5; Savage Aff. at ¶¶ 33, 40; Doc. 61-86). All of this led Captain Savage to believe that Senanayake did not have the confidence of her supervisors or peers. (Doc. 61-91 at 5).

---

[5]  The Review provided a sampling of the concerns regarding Senanayake. Documentation of additional instances was made in monthly observation reports, emails and citizen complaints. (Docs. 61-75, 61-83, 61-84, 61-85, 61-86). One additional incident involved a citizen complaint that Senanayake had racially profiled a black motorist in March 2012. The motorist filed a civil rights lawsuit, which the county agreed to settle. (Docs. 61-101, 61-117).

[6]  Sergeant Robert Spring prepared a monthly observation report on Senanayake shortly after Sheriff Davis resigned. (Doc. 61-86). He gave her marks of "Not Acceptable" or "Needs Improvement" in each and every subcategory within the general categories of performance, knowledge and behavior. Spring stated that it was the first time that he could honestly assess Senanayake's performance without fear of reprisal from Sheriff Davis. (Spring Aff. at ¶ 11).

Captain Savage also documented Senanayake's leave usage, which totaled 300 hours of leave in less than one year. (Doc. 61-91 at 2-3). He believed that this amount of leave was abusive and "unprecedented" for a probationary employee and was made possible by "special treatment from the Sheriff." (Savage Aff. at ¶ 36). Captain Savage found that Senanayake's excessive leave usage impeded her ability to develop the skills needed to be a good deputy. (Id.).

Acting Sheriff Vance and Captain Savage agreed that Senanayake had not satisfactorily completed her probationary period and "was wholly unfit to serve." (Vance Aff. at ¶ 8). Captain Savage could not recall a probationary employee ever performing so poorly, and they were troubled that she could not grasp many aspects of police work despite having been employed in law enforcement on three prior occasions. (Savage Aff. at ¶ 38). They believed that she was "not safe to put on the road" and was "a liability to the County." (Id.; Vance Aff. at ¶ 8).

### K. EEOC Charge and Filing of this Suit

Senanayake filed a charge of discrimination with the Equal Employment Opportunity Commission on May 1, 2012. (Doc. 61-123). In her charge she complained that Pitts had sexually harassed her and that she was retaliated against after she reported the harassment to her supervisor. The charge did not include an allegation that her termination was an act of sex discrimination.

Senanayake's amended complaint in this action contains four federal claims: hostile work environment under Title VII, retaliation under Title VII, sex discrimination under Title VII, and disability discrimination under the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101, *et seq.* She also asserts corresponding claims under state law, O.R.C. § 4112.02(A), for which the same analysis applies as that under federal law. See Smith v. Dep't of Pub. Safety, 997 N.E.2d 597, 614 (Ohio Ct. App. 2013) ("Due to the similarities in Title VII and R.C. Chapter 4112, Ohio courts look to federal case law addressing Title VII for assistance in interpreting R.C. Chapter 4112."); Hedrick v. W. Reserve Care Sys., 355 F.3d 444, 452 n.4 (6th Cir. 2004) ("Because the essential elements of an ADA claim and a claim under the Ohio handicap discrimination statute are identical, our analysis of Hedrick's ADA claim also resolves her state law claim.").

## II. Standard of Review

Under Federal Rule of Civil Procedure 56, summary judgment is proper if the evidentiary materials in the record show that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see Longaberger Co. v. Kolt, 586 F.3d 459, 465 (6th Cir. 2009). The moving party bears the burden of proving the absence of

genuine issues of material fact and its entitlement to judgment as a matter of law, which may be accomplished by demonstrating that the nonmoving party lacks evidence to support an essential element of its case on which it would bear the burden of proof at trial. See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Walton v. Ford Motor Co., 424 F.3d 481, 485 (6th Cir. 2005).

The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (emphasis in original); see also Longaberger, 586 F.3d at 465. "Only disputed material facts, those 'that might affect the outcome of the suit under the governing law,' will preclude summary judgment." Daugherty v. Sajar Plastics, Inc., 544 F.3d 696, 702 (6th Cir. 2008) (quoting Anderson, 477 U.S. at 248). Accordingly, the nonmoving party must present "significant probative evidence" to demonstrate that "there is [more than] some metaphysical doubt as to the material facts." Moore v. Philip Morris Cos., Inc., 8 F.3d 335, 340 (6th Cir. 1993).

A district court considering a motion for summary judgment may not weigh evidence or make credibility determinations. Daugherty, 544 F.3d at 702; Adams v. Metiva, 31 F.3d 375, 379 (6th Cir. 1994). Rather, in reviewing a motion for summary judgment, a court must determine whether "the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson, 477 U.S. at 251-52. The evidence, all facts, and any inferences that may permissibly be drawn from the facts must be viewed in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Eastman Kodak Co. v. Image Technical Servs., Inc., 504 U.S. 451, 456 (1992). However, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." Anderson, 477 U.S. at 252; see Dominguez v. Corr. Med. Servs., 555 F.3d 543, 549 (6th Cir. 2009).

## III. Discussion

### A. Hostile Work Environment Claim

Senanayake alleges that the sexual harassment she received from Pitts created a hostile work environment. Title VII prohibits discrimination based on sex where harassment is "sufficiently severe or pervasive" so as "to alter the conditions of the victim's employment and create an abusive working environment." Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993) (internal quotation

marks omitted).  In order to establish a hostile work environment claim, plaintiff must show that: (1) she was a member of a protected class; (2) she was subjected to unwelcome harassment; (3) the harassment complained of was based upon sex; (4) the harassment created a hostile work environment; and (5) the employer knew or should have known of the charged sexual harassment and failed unreasonably to take prompt and appropriate corrective action.  Williams v. Gen. Motors Corp., 187 F.3d 553, 560 (6th Cir. 1999).

As an initial matter, the parties dispute how much harassment Senanayake was subjected to and whether it was unwelcome.  Plaintiff contends that Pitts repeatedly made unwelcome sexual comments to her.  Defendants argue that plaintiff's version of events is uncorroborated and that Pitts made only one arguably sexually-related comment to Senanayake – the baby-making comment – which he said in reaction to her grabbing her crotch and telling him that he "could not handle this."  Defendants claim that much of the alleged harassment amounted to no more than compliments, flirtatious behavior and "banter that is commonplace amongst police officers."  (Doc. 69 at 16).

Defendant's argument must be rejected.  At the summary judgment stage, the court does not make credibility determinations.  Senanayake testified that she did not make any gesture or comment which would have prompted or welcomed Pitts to exclaim that she should have his baby.  And though Pitts denied having made any further sex-based comments, Senanayake testified that he regularly made statements about her physical appearance and about his desire to take her out on a date.  It is true that a one-time compliment of "you are beautiful" or a request to go on a date would not constitute unwelcome harassment.  See Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81 (1998) (ordinary flirtation not sufficient).  But Senanayake testified that Pitts did much more – he made specific comments about her breasts and legs, about her being "hot" and "sexy" and about wanting to be with her.  She also testified that she consistently refused his overtures and repeatedly asked him to stop making such comments, but he persisted.   If a jury credited Senanayake's testimony, it could reasonably find that she was subjected to unwelcome harassment.

In order to prevail on her claim, plaintiff must also establish that the alleged sexual harassment created a hostile work environment.  The harassment must be so "severe or pervasive" as to alter a "term, condition or privilege" of employment.  Moore v. KUKA Welding Sys. & Robot Corp., 171 F.3d 1073, 1078 (6th Cir. 1999).  The court must consider the "totality of circumstances," including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes

with an employee's work performance." Williams v. CSX Transp. Co., 643 F.3d 502, 512 (6th Cir. 2011) (internal quotation marks omitted). The inquiry has both objective and subjective components: "whether a reasonable person would find the environment objectively hostile" and "whether the plaintiff subjectively found the conduct 'severe or pervasive.'" Williams v. Gen. Motors, 187 F.3d at 568.

The court finds that there is sufficient evidence to support a finding that the alleged harassment was sufficiently severe or pervasive as to alter the conditions of plaintiff's employment. Important to the court's conclusion is the evidence that the alleged harassment lasted for at least seven months and occurred nearly every time Senanayake had contact with Pitts and that the demeaning conduct took place in settings in which Pitts undermined Senanayake in front of co-workers and the inmates over whom she was to exercise authority. Pitts made his first baby-making comment near the beginning of her time as a corrections officer, and he made it in the presence of co-workers and inmates. According to Senanayake, Pitts continued to make unwelcome comments to her on a constant basis for the remaining seven months that she was a corrections officer. The comments included baby-making type statements, requests that she go out with him, observations about her body and appearance, and expressions of his desire to have her "on his arm" and marry her. Some portion of the behavior occurred in the booking area of the jail, in front of co-workers and inmates.

The alleged harassment also included several occasions in which Pitts tapped Senanayake's backside with a clipboard after roll call. As noted above, it is unclear when this conduct occurred, but it likely started when she was reporting for ride-alongs. (Senanayake Dep. at 177). Senanayake was unsure whether other officers saw the conduct take place. (Id. at 179-80). Nonetheless, it took place in a room with deputies present, at a stage of her employment when Senanayake was attempting get training and establish herself as a deputy.

The evidence further supports an inference that Senanayake could not easily avoid the harassment. She testified that Pitts would come to the jail to see her and make comments to her even when he did not have an inmate to drop off and thus lacked a job-related reason to be there. She also regularly encountered him during roll call. And several months after she became a deputy, he conducted a traffic stop of her when she was off-duty.

The alleged circumstances of this traffic stop bolster plaintiff's claim. Pitts's behavior was more intimidating and perhaps more overtly sexual. Pitts let her know that he had turned off his

microphone and that he pulled her over solely to look what she was wearing. He made a remark about her breasts and stated a desire to take her somewhere when he got off work.

Defendants argue that there is not sufficient evidence to establish that Senanayake suffered any adverse effect from the alleged harassment. Defendants emphasize that Senanayake's own conduct, and not that of Pitts, was the reason why co-workers did not respect her. They cite evidence that she was unduly critical of co-workers and that the Kissing Cop video was known to co-workers and inmates alike. Defendants further contend that Senanayake enjoyed special treatment and protection from Sheriff Davis, who hastened her advancement to deputy and whose retaliatory behavior dissuaded anyone from making even the slightest critique of her. (Doc. 69 at 14) (arguing that plaintiff "presents no corroborating evidence. . . . Given the shielded environment Sheriff Davis created for her, no reasonable juror could believe the Sheriff would allow Dep. Pitts to harass his girlfriend.").

The considerations raised by defendants go to the weight of the evidence and are best left for a jury to resolve. Much of the alleged harassment which Senanayake received from Pitts took place before the period of alleged favoritism. A jury could reasonably find that she suffered severe and pervasive sexual harassment as a corrections officer even if she later enjoyed favorable treatment as a deputy. Senanayake has presented evidence that she experienced sustained harassment which was demeaning, embarrassing and harmed her standing in the eyes of co-workers and inmates. (Senanayake Dep. at 174-92). According to Senanayake, people mistreated her and interfered with the performance of her job because "you have someone who is wearing the same uniform that disrespects you." (Id. at 192). She testified that Pitts made sexually-harassing comments to her at the jail in front of inmates and that inmates would not show her "an ounce of respect." (Id. at 227). Inmates made comments similar to the ones made by Pitts, mocking her and saying that she could not discipline them because they were merely repeating what her colleague had said to her. Senanayake further testified that she received messages, some vulgar, from employees who exhibited extreme disrespect towards her as a female officer. The court finds that this testimony, if credited, would support a finding that the alleged harassment adversely interfered with her work and altered the conditions of her employment. See Harris, 510 U.S. at 21 ("When the workplace is permeated with discriminatory intimidation, ridicule, and insult, . . . that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.") (internal quotation marks and citations omitted).

The final element of plaintiff's claim is that the employer knew or should have known of the charged sexual harassment and failed unreasonably to take prompt and appropriate corrective action. "Generally, a response is adequate if it is reasonably calculated to end the harassment." Jackson v. Quanex Corp., 191 F.3d 647, 663 (6th Cir. 1999). Reasonably appropriate corrective action may include "promptly initiating an investigation to determine the factual basis for the complaint, speaking with the specific individuals identified by the complainant, following up with the complainant regarding whether the harassment was continuing, and reporting the harassment to others in management." Waldo v. Consumers Energy Co., 726 F.3d 802, 814 (6th Cir. 2013) (internal alterations and quotation marks omitted).

Defendants' sole argument on this issue is that Sergeant Burke, Senanayake's supervisor, acted quickly and appropriately once he became aware that Pitts had made the first baby-making comment to Senanayake. They argue that Burke said something to Pitts within a couple of days and that Pitts was no longer flirtatious and instead adopted an impersonal, non-harassing demeanor toward her.

The court must reject this argument as well. There is a genuine dispute of fact over what exactly Senanayake told Burke and how Burke responded. Senanayake testified that she complained to Burke about all of the comments Pitts made, while Burke testified that she told him about only the first baby-making statement. As to Burke's response, Senanayake believed that Burke did in fact say something to Pitts but that Burke defended his friend Pitts and they both subsequently acted in a threatening manner towards her, including Pitts engaging in sexually-harassing and stalking-type behavior when he conducted the traffic stop of Senanayake. According to Burke, he said nothing at all and took no action in response to Senanayake's complaint, because Senanayake herself asked that he not do anything. Depending on which parts of the testimony a jury found to be credible, a jury could find that Burke was aware of the full array of unwelcome comments made by Pitts but failed to take measures reasonably calculated to end the harassment.

Moreover, Senanayake has presented evidence that well before her conversation with Burke, she made Sergeant Jackson, her supervisor at the jail, aware of Pitts's behavior and that Jackson did nothing in response. Senanayake testified that Jackson personally observed Pitts make sexually harassing comments at the jail and that she complained to Jackson about the harassment and let her know that it was "awful" and embarrassing. She further testified that Jackson witnessed Pitts come to the jail for no reason other than to see her. (Senanayake Dep. at 186-87). Despite telling Senanayake that she would handle the matter, Jackson never did and Pitts's behavior continued.

Defendants tell a different version of events, but if a jury were to credit Senanayake's testimony, it could find that Jackson was aware of the sexual harassment and took no action to address it.

Accordingly, the court finds that defendants are not entitled to summary judgment against plaintiff's hostile work environment claim.

### B. Retaliation Claim

Title VII prohibits an employer from retaliating against an employee because he has opposed an employment practice made unlawful under Title VII. 42 U.S.C. § 2000e–3(a). Where, as here, a retaliation claim relies on circumstantial evidence, the claim is analyzed under the burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). In order to establish a *prima facie* retaliation case, plaintiff must show that: (1) she engaged in protected activity, (2) her exercise of protected rights was known to her employer, (3) her employer thereafter took an adverse employment action against her or she was subjected to severe or pervasive retaliatory harassment by a supervisor, and (4) there was a causal connection between her protected activity and the adverse employment action or harassment. Morris v. Oldham Cty. Fiscal Court, 201 F.3d 784, 792 (6th Cir. 2000).

Plaintiff has submitted evidence to support a finding that she engaged in protected activity. Near the beginning of her time as a deputy, she approached Burke and told him about the sexually-harassing conduct of Pitts. Several months later, she told Chief Petrozzi that Burke was retaliating against her for having complained about Pitts.

Putting aside the second element of the *prima facie* case for the moment, the court notes that complaint alleges two forms of retaliation: (1) termination and (2) unfair and intimidating treatment from plaintiff's supervisors and co-workers. (Doc. 22 at ¶¶ 115-16).

Defendants' motion for summary judgment addresses only plaintiff's termination. In response to the motion, plaintiff argues that the retaliatory conduct included more than the termination. (Doc. 62 at 37). Senanayake testified that Burke and Pitts took on a cold and intimidating demeanor toward her, that Pitts threatened to withhold back-up assistance because she was a "snitch," and that Burke unduly criticized the way she conducted traffic stops and unfairly resisted her efforts to take leave. In their reply brief, defendants' lone retort is that male officers likewise found Burke to be "demanding and difficult to work for" and thus Burke "treated [Senanayake] similarly to male subordinates." (Doc. 69 at 31). Even if true, defendants' assertion is not fatal to plaintiff's claim because the claim does not hinge on gender-based animus but rather on retaliation against the exercise of a protected activity. For purposes of a *prima facie* case, plaintiff has

adequately shown a causal connection between her protected activity and the retaliation. She has testified that Burke started treating her in an unfair, harsh and intimidating manner immediately after she complained to him about Pitts, his friend. Because defendants offer no other argument regarding the second alleged form or retaliation, that aspect of plaintiff's retaliation claim survives the motion for summary judgment.

As for plaintiff's termination, defendants argue that the second element of the *prima facie* case is not satisfied because the decisonmakers, Acting Sheriff Vance and Captain Savage, had no knowledge of her complaints. Defendants have submitted evidence that neither Vance nor Savage knew, at the time they decided to terminate Senanayake, that she had complained of harassment by Pitts or retaliation by Burke. (Vance Dep. at 49-50; Vance Aff. at ¶ 7; Savage Dep. at 78, 83-84, 121, 125, 228, 262, 271-72; Savage Aff. at ¶ 33, 38).

In response, plaintiff claims that "Vance testified that he was aware that Plaintiff had complained about sexual harassment and retaliation," but plaintiff does not cite any evidence in support of this assertion. (Doc. 62 at 37). There is no testimony from Senanayake that she informed Vance of her complaints, and Vance testified that he did not know about Senanayake's complaints of harassment and retaliation until after this lawsuit was filed. (Vance Dep. at 49-50). The only "complaint" Vance knew about took place in the aftermath of Pitts accusing Senanayake of racially profiling him in making the March 7, 2012 traffic stop. To Vance's knowledge, Senanayake complained to Sheriff Davis about Pitts's accusation, and Sheriff Davis then yelled at Pitts and threatened to fire him. (Vance Dep. at 26-27; Vance Aff. at ¶ 6).

Plaintiff also asserts that both Vance and Savage must have known of Senanayake's complaint of retaliation by Burke because they were copied on an email chain about her IOC. The court finds that the evidence does not support a reasonable inference in support of plaintiff's position. Senanayake submitted the IOC to Lieutenant Buttler requesting a meeting with the command staff and Burke. Vance and Savage never saw the IOC. (Vance Aff. at ¶ 7; Savage Dep. at 123). After not hearing back from Buttler, Senanayake emailed him (and copied Sheriff Davis, Vance, Savage and Petrozzi) to ask about the status of the "requested meeting." (Doc. 61-104 at 5). Senanayake's email did not make any reference to her complaint of retaliatory treatment by Burke. Buttler responded that he had presented her IOC to Petrozzi, and Petrozzi emailed the command staff, Vance and Savage included, asking about their availability for "a meeting with Deputy Senanayake to discuss her concerns related to Sgt. Burke." (Id. at 3).

There is no evidence showing the Vance and Savage knew of the backstory or context to Senanayake's "concerns," such that they should have known that her concerns likely related to alleged retaliation by Burke. Again, neither Vance nor Savage were aware that she had complained to Burke about Pitts or had complained to Petrozzi about Burke. Standing alone, the email informed Vance and Savage only of the existence of "concerns" related to Burke; it did not make them aware that Senanayake had complained of harassment and retaliation. Savage believed that the requested meeting somehow involved Burke "not communicating well with her," but "anything else above that, [he didn't] know what it was about." (Savage Dep. at 125, 272). The meeting never took place (due to Burke's extended medical leave), and when Vance and Savage decided four months later to release Senanayake from her probationary period, they still had no knowledge of the nature of her concerns. (Vance Aff. at ¶ 7; Savage Aff. at ¶ 38).

The court further finds that even if plaintiff could establish a *prima facie* case of retaliatory termination, defendants would be entitled to summary judgment because plaintiff would not be able to rebut defendants' legitimate, nondiscriminatory reason for her termination. See Martin v. Toledo Cardiology Consultants, Inc., 548 F.3d 405, 412 (6th Cir. 2008). Defendants have submitted extensive evidence of the performance-related reasons for their decision to terminate Senanayake's employment. The record of her incidents of misconduct and deficiencies included: at-fault accidents in her police cruiser, failing to appear at court hearings, cell phone usage while operating a cruiser, a lack of knowledge of police policies and procedures, an inability to navigate around the county, preparing incomplete and inaccurate police reports, excessive leave usage, an unwillingness to learn and hostility to correction and supervision. This led defendants to reasonably conclude that she had not satisfactorily completed her probationary period.

When an employer meets its burden of establishing a legitimate, nondiscriminatory reason for its action, the burden then shifts to plaintiff to demonstrate that the legitimate reason given by the employer was a pretext for retaliation. Martin, 548 F.3d at 412. "In order to establish pretext, a plaintiff must demonstrate that (1) the proffered reason had no basis in fact; (2) the proffered reason did not actually motivate plaintiff's termination; or (3) the proffered reason was insufficient to motivate plaintiff's discharge." Id.

Plaintiff contends that the proffered reasons did not actually motivate her termination. She argues that the End-of-Probation Review included unsubstantiated accusations which Vance and Savage accepted as true without regard to whether the accusations had been properly investigated.

In her view, Vance and Savage acted upon retaliatory motives rather than out of true concern for her alleged misconduct and deficiencies.

The court finds that plaintiff has failed to create a genuine issue of material fact regarding this theory of pretext. Defendants have established that, without dispute, Senanayake's supervisors operated in an environment in which they legitimately feared retaliation from Sheriff Davis when they investigated her or attempted to correct a performance problem. (Burke Aff. at ¶¶ 3-5; Dore Aff. at ¶ 2; Petrozzi Aff. at ¶¶ 9, 11; Spring Aff. at ¶ 3; Turner Aff. at ¶ 3). Despite not documenting every issue they had with Senanayake and despite knowing that Sheriff Davis's influence precluded the usual course of investigation and discipline, her supervisors did keep record of numerous issues and deficiencies that they personally observed or investigated and found to be substantiated. (Docs. 61-75; 61-80; 61-83; 61-85; 61-86; 61-88; 61-91; 61-116; Petrozzi Aff. at ¶ 17). Savage included many of these incidents in his listings of "Disciplinary Issues" and "Documented Incidents" in the End-of-Probation Review.

Though broadly claiming that the Review was based on unsubstantiated accusations, plaintiff points to only two items in the Review as having been unsubstantiated and accepted as true by Vance and Savage. The first is a January 2012 incident in which Senanayake allegedly got into an altercation with another deputy while at the scene of a shooting. However, the Review specifically stated that "[u]pon review of the incident it was undetermined what actually transpired between the two of them." (Doc. 61-91 at 4). Savage did not merely accept the accusation as true; he expressly noted in the Review that he could not determine what had occurred.

The second item is the accusation Pitts made in March 2012 that Senanayake had racially profiled him in making a traffic stop. However, the Review described the matter as simply a "complaint" and did not characterize the accusation as being true. It is undisputed that Vance and Savage both knew that the accusation was not investigated because Sheriff Davis had intervened and threatened to fire Pitts. (Vance Aff. at ¶ 6; Savage Aff. at ¶ 39). The Review thus described the complaint for what Vance and Savage knew it to be – an accusation that had not been investigated or substantiated. Plaintiff has put forth no evidence showing that Vance and Savage treated the accusation as being true.

Plaintiff's next theory regarding pretext is that her misconduct and deficiencies were insufficient to justify termination because she committed minor offenses or made mistakes that other deputies had made. It is true that, when viewed in isolation, a handful of her offenses appear to be minor (reporting to work without her tie) or mistakes that others had made (missing court).

But plaintiff was not an employee who committed only a few isolated mistakes. The unrebutted evidence establishes that her combined instances of misconduct and deficiencies numbered in the dozens and included serious and repeated problems. This record of issues, along with Senanayake's unwillingness to learn and hostility to correction, led Vance and Savage to conclude that her poor performance warranted termination. (Savage Aff. at ¶ 38) (stating that he and Vance based their decision on the totality of events). A jury could not reasonably conclude that plaintiff's termination was based solely on minor or common mistakes.

Finally, plaintiff contends that her misconduct and deficiencies were insufficient to justify termination because Sheriff Davis had a practice of giving probationary deputies a six-month extension of their probationary periods. (Doc. 66-2). Again, however, plaintiff's argument ignores her poor performance record. Defendants have demonstrated that Lee Ranzy, the only other probationary deputy with performance problems as extensive as plaintiff's, was not given a six-month extension in 2009. (Vance Aff. at ¶ 8; Docs. 61-33, 61-120). Moreover, when Vance became Acting Sheriff, he ceased the practice of six-month extensions. (Aug. 4, 2016 Savage Aff. at ¶ 9). Ohio law provides that probationary periods shall be "no more than one year." O.R.C. § 127.27(B). The Delaware County Sheriff's Office has not granted any six-month extensions to probationary employees since Sheriff Davis's resignation. (Aug. 4, 2016 Savage Aff. at ¶ 9). In sum, a jury could not reasonably find that defendants' decision to terminate plaintiff instead of extending her probationary period shows that defendants' stated reasons for terminating her were pretext for retaliation.

Accordingly, the court finds that defendants are entitled to summary judgment on plaintiff's claim that her termination was an unlawful act of retaliation.

### C.      Sex Discrimination

Plaintiff claims that she was terminated because she is a woman, while male deputies with disciplinary issues were not terminated. Title VII prohibits discrimination against an employee on the basis of sex. 42 U.S.C. § 2000e-2(a)(1). Defendants argue as a threshold matter that plaintiff's claim fails because she did not include this claim of sex discrimination in her EEOC charge.

In a state like Ohio with its own employment discrimination laws, a plaintiff must file a complaint with the EEOC within 300 days of an unlawful employment action in order to then bring a Title VII claim. Amini v. Oberlin Coll., 259 F.3d 493, 498 (6th Cir. 2001). A charge of discrimination must contain "a written statement sufficiently precise to identify the parties, and to describe generally the action or practices complained of." 29 C.F.R. § 1601.12(b). "The purpose of

filing a charge of discrimination is to trigger the investigatory and conciliatory procedures of the EEOC so that the Commission may first attempt to obtain voluntary compliance with the law." Davis v. Sodexho, Cumberland Coll. Cafeteria, 157 F.3d 460, 463 (6th Cir. 1998). "These investigatory and conciliatory procedures notify potential defendants of the nature of plaintiffs' claims and provide them the opportunity to settle the claims before the EEOC rather than litigate them." Id.

Plaintiff filed an EEOC charge on May 1, 2012 in which she checked boxes for discrimination based on race,[7] retaliation and sex. In her statement providing the particulars of the discrimination, plaintiff confined her description of the alleged sex discrimination to sexual harassment: "Rashad Pitts (former co-worker) has continually harassed me with unwanted sexual comments . . . . I believe that I was sexually harassed due to my sex, female . . . ." (Doc. 61-123). The charge also alleged that plaintiff was discharged in retaliation for complaining about the harassment and because of her race, but it contained no allegation that her termination was based on her sex.

A charge is sufficient to support claims broader than those charged when either "the EEOC investigation of one charge *in fact* reveals evidence of a different type of discrimination against the plaintiff" or "where facts related with respect to the charged claim would prompt the EEOC to investigate a different, uncharged claim." Davis, 157 F.3d at 463 (emphasis added).

In response to the motion for summary judgment, plaintiff relies only on the first exception. In a single sentence she argues, "Here, Plaintiff's assertions regarding sexual harassment and retaliation prompted the EEOC to explore sex discrimination claims as well." (Doc. 62 at 22). Plaintiff provides no citation to evidence or any further explanation in support of this assertion. In the Right to Sue notice received by plaintiff, the EEOC simply stated that it was "unable to conclude" that there were "violations of the statutes" by defendants. (Doc. 1-1). The EEOC did not indicate that it had investigated, or found evidence of, plaintiff's termination as an act of sex discrimination. Because plaintiff has not established that the EEOC investigation of her charge in fact revealed evidence of sex discrimination, her sex discrimination claim is time-barred.

Even if plaintiff's EEOC charge were deemed to be sufficient to encompass her sex discrimination claim, the court finds that defendants are entitled to summary judgment because plaintiff has not presented facts from which a jury could reasonably conclude that her termination

---

[7] Senanayake's father is Sri Lankan. (Doc. 61-30; Senanayake Dep at 17, 36). A racial discrimination claim is not part of this lawsuit.

was pretext for sex discrimination. Plaintiff repeats the same pretext arguments as she offered with respect to her retaliation claim, and the court finds that these arguments fail for the reasons stated above. Regarding her failure-to-receive-an-extension theory of pretext, defendants have established that a male probationary employee, Lee Ranzy, did not receive an extension and was terminated for reasons similar to the ones for which Senanayake was terminated.

### D. Disability Discrimination

Plaintiff alleges that her knee injury caused her to be disabled and that defendants terminated her because of this disability. An essential element of a claim under the ADA is that the plaintiff is an individual with a disability. Hedrick v. W. Reserve Care Sys., 355 F.3d 444, 452 (6th Cir. 2004). A "disability" is defined as: "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2); Toyota Motor Mfg., Kentucky, Inc. v. Williams, 534 U.S. 184, 193 (2002).

Only the first definition of disability is at issue here. In determining whether an individual is substantially limited in performing a major life activity, courts consider the following factors: "(1) the nature and severity of the impairment; (2) the duration or expected duration of the impairment, and (3) the permanent or long-term impact of the impairment." Cardenas-Meade v. Pfizer, Inc., 510 Fed. App'x 367, 370 (6th Cir. 2013); Novak v. MetroHealth Med. Ctr., 503 F.3d 572, 581 (6th Cir. 2007). "Generally, short-term temporary restrictions are not substantially limiting." Roush v. Weastec, Inc., 96 F.3d 840, 843 (6th Cir. 1996); see also Guzman–Rosario v. United Parcel Serv., 397 F.3d 6, 10 (1st Cir. 2005) (holding that impairments that are "foreseeably temporary" cannot be disabilities); Summers v. Altarum Institute, Corp., 740 F.3d 325, 329 (2nd Cir. 2014) (temporary impairments may be covered only if sufficiently severe).

Defendants argue that there is no evidence from which a jury could find that plaintiff had a physical impairment which substantially limited a major life activity. The court agrees, and plaintiff's response brief offers no argument to the contrary. Plaintiff suffered a knee contusion which caused temporary pain and swelling. An MRI showed that Senanayake did not tear her meniscus. According to plaintiff's own deposition testimony and medical records, within three weeks of the injury her knee was "a lot better," she had a full range of motion, the swelling was gone and her doctor released her to immediately return to "full activities unrestricted."

**IV.     Conclusion**

For the reasons set forth above, defendants' motion for summary judgment (Doc. 61) is granted in part and denied in part.  The motion is granted as to plaintiff's claim for retaliatory termination, sex discrimination and disability discrimination.  The motion is denied as to plaintiff's claim for hostile work environment and retaliation based on conduct other than termination.


s/ James L. Graham
JAMES L. GRAHAM
United States District Judge

DATE: June 22, 2017